**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT GLEN MYERS,<br><br>Plaintiff,<br><br>vs.<br><br><br>DIERBERGS MARKETS, INC.<br>For Profit Corporation<br>d/b/a DIERBERGS<br><br><br>Defendant(s). | ) | CASE NO.:<br><br>INJUNCTIVE RELIEF SOUGHT |

**COMPLAINT**

Plaintiff, ROBERT GLEN MYERS (hereinafter "MYERS"), by and through the undersigned counsel, hereby files this Complaint and sues DIERBERGS MARKETS, INC., For Profit Corporation, d/b/a DIERBERGS ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.dierbergs.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MYERS, full and equal access to Defendant's products and services.

2. MYERS files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3. Accordingly, MYERS seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure Defendant's Website does not become inaccessible again in the future.

**JURISDICTION AND VENUE**

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Eastern Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court for the Eastern District of Missouri in that a substantial part of the acts and omissions giving rise to MYERS' claims occurred in St. Louis County, Missouri.

6. Defendant attempts to, and indeed does, participate in St. Louis County's economic life by offering and providing products and services over the internet to St. Louis County's residents, but also extends it services to other residents within the state of Missouri through its online presence, including MYERS, who is a resident of Caldwell County, Missouri. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Missouri residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Missouri every time a Missouri resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 16690 Swingley Ridge Rd., Chesterfield, Missouri 63017 (hereinafter "Defendant's Principal Place of Business"), which is located in St. Louis County, Missouri.

8. MYERS was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

**PARTIES**

9. MYERS is a natural person over the age of 18 and is blind.

10. MYERS is *sui juris* and is a resident of the State of Missouri residing in Hamilton, Missouri, located in Caldwell County.

11. MYERS is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MYERS is legally blind from age-related macular degeneration[1], and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MYERS uses screen access software to access digital content, like text messages, emails, and websites.

12. MYERS cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

[1] The term "blind" or "blind person" as used throughout this complaint refers to persons with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200. Some blind people who meet this definition have limited vision, whereas others have no vision.

reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MYERS' blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MYERS frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MYERS uses commercially available screen reader software to interface with the various websites.

15. Defendant is For Profit Corporation with a Principal Place of Business of 16690 Swingley Ridge Rd., Chesterfield, Missouri 63017 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates at Defendant's Principal Place of Business. Defendant offers a variety of services and products including a bakery, deli, and florist. Defendant's Website provides a platform for customers to sign in and access rewards and personal information. Customers can also create shopping lists, purchase items for delivery or catering, and manage their cart at

Defendant's website. Customers can also access weekly ads and digital coupons to be used to purchase goods in store. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website's development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as "place of public accommodation".

19. Defendant's Website serves as a vital extension of Defendant's Principal Place of Business by offering services and information that are integral to the customer experience at Defendant's Principal Place of Business. Defendant's Website provides an online platform where customers can access detailed descriptions of the bakery, deli, and florist services available at Defendant's Principal Place of Business, thus reinforcing the connection between Defendant's Website and Defendant's Principal Place of Business shopping experiences. Additionally, Defendant's website allows customers to engage with Defendant more conveniently through features like online rewards, personalized shopping lists, and cart management, which reflect the personalized service ethos of Defendant's Principal Place of Business. By offering essential business details such as operating hours and contact information, Defendant's Website facilitates easy communication and planning for visits, thereby enhancing the accessibility and reach of Defendant's services beyond the confines of Defendant's Principal Place of Business.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MYERS is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. Defendant's Website functions as a digital extension of Defendant's Principal Place of Business, providing essential services and information that strengthen the connection between Defendant's website and Defendant's Principal Place of Business. Defendant's Website offers a comprehensive overview of Defendant's Principal Place of Business services such as the bakery, deli, and florist, which are integral parts of the shopping experience at Defendant's Principal Place of Business. By allowing customers to sign in for rewards and manage their shopping lists and carts online, Defendant's Website enhances customer convenience and engagement, mirroring the personalized service one would expect at Defendant's Principal Place of Business. Furthermore, Defendant's Website provides key information such as business hours and contact details, facilitating seamless communication and planning for prospective visits. Defendant's Website not

only broadens the accessibility of Defendant's products and services but also ensures continuity in customer service, effectively functioning as an extension of Defendant's Principal Place of Business.

23. Defendants' Website is additionally used to search for brick and mortar store locations, check Defendant's hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase in the Defendant's Principal Place of Business and sign up for an electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use in the Defendant's Principal Place of Business from his home are important accommodations for MYERS because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MYERS' in-store experience, such that they are tied to and provide a benefit to MYERS. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MYERS accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MYERS may view several dozen websites to compare features, discounts, promotions, and prices.

26. MYERS utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MYERS attempted to utilize Defendant's Website:

a. March 02, 2025;

b. March 21, 2025;

c. April 22, 2025;

d. July 08, 2025; and

e. September 14, 2025.

(hereinafter "MYERS' Website Visits"). During MYERS' Website Visits, MYERS experienced substantial access barriers and, thus, was denied fair and equal access to same. MYERS was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MYERS sent a pre-suit communication on March 21, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MYERS has continued to attempt to utilize Defendant's Website during MYERS' Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continued to contain access barriers that prevented free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31. MYERS adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria,

segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[2]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[3] and private individuals[4] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[5]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[6] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled." [7]

---

[2] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[3] 42 U.S.C. § 12188(b).
[4] 42 U.S.C. § 12188(a).
[5] Johnson, *supra* note 8.
[6] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[7] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[8]

40. Consistent with these policies, MYERS files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing the opportunity to search and utilize Defendant's Website to explore and pre-shop Defendant's merchandise available for purchase, as well as to sign up for electronic communications to receive offers, benefits, exclusive invitations, and discounts for use in the physical stores, are important accommodations for MYERS because traveling outside of his home as a visually disabled individual is often difficult, hazardous, frightening, frustrating, and confusing. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software..

---

[8] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would

fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MYERS, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MYERS encountered barriers on each of MYERS' Website Visits. On or about March 2, 2025, MYERS initially attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website

and/or understand the content therein because numerous portions of the Defendant's Website do not interface with MYERS's screen reader software. Specifically, features of Defendant's Website are inaccessible to MYERS' screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing skip to content link**

i. **Issue:** The absence of a 'Skip to Content' link on the website constitutes a significant impediment for screen reader users and individuals relying solely on keyboard navigation. This omission requires users to navigate through all navigation items before accessing the main content, thereby causing unnecessary delays and frustration. This issue not only affects screen reader users but also those with motor disabilities who depend on keyboard navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** The absence of the 'Skip to Content' link significantly hampers accessibility for screen reader and keyboard-only users. These users are compelled to navigate through repetitive navigation items before reaching the main content, resulting in a time-consuming and frustrating experience. This particularly affects individuals who rely on keyboard navigation due to motor disabilities. Expected Behavior: Skip links should be included on each webpage to facilitate quick navigation to the main content, bypassing repetitive navigation links. This enhancement benefits both screen reader and keyboard-only users by allowing them to swiftly access the core content of a webpage. If visible skip links disrupt the webpage design, hidden skip links should be provided and made visible upon receiving keyboard focus.

**b. Menu items inaccessible for screen reader users**

i. **Issue:** The header menu lacks appropriate roles for 'menu' and 'menu items' and fails to indicate its expanded or collapsed state. Consequently, when users activate the menu button, the keyboard focus remains on the button instead of advancing to the menu items, creating confusion and navigation difficulty for screen reader users. Keyboard-only users also face challenges in smoothly navigating through menu options.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Menubar Navigation

iii. **Impact:** The header menu's failure to incorporate the correct roles for 'menu' and 'menu items', along with the absence of an expanded or collapsed state indication, poses a significant accessibility barrier. Screen reader users face uncertainty regarding the menu's state and difficulty navigating it. Similarly, keyboard-only users encounter challenges in smoothly transitioning through menu options. Expected Behavior: All interactive elements must be accessible for assistive technology users, including screen reader users. For custom components, it is imperative to provide necessary information, such as name, role, state, and value, to assistive technologies, ensuring users can effectively interact with these components. Incorrect role definitions can hinder screen reader users' comprehension of content structure.

**c. Content not hidden for screen reader users**

i. **Issue:** Hidden menu items inadvertently receive keyboard focus during navigation through the header section, creating confusion and frustration for keyboard-only users. These users may not realize where the focus has landed or why it is there. For screen reader users, this issue presents an even greater challenge, as they might not receive adequate context to comprehend the button's purpose, leading to disorientation and navigation difficulties.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** The unintended focus on hidden menu items results in a disorienting and frustrating experience for keyboard-only users, who may struggle to ascertain their current focus location. Screen reader users experience significant barriers due to insufficient context, impeding their ability to understand the button's purpose and navigate effectively. Expected Behavior: Visual focus indication on the screen aids users in determining their location, benefiting individuals with low vision, elderly users, keyboard-only users, and those with mobility impairments. In the absence of focus indication, users face challenges in accessing webpage information. When hidden content receives keyboard focus, sighted keyboard-only users struggle to discern which links they are on, leading to a poor user experience.

**d. No mechanism is provided to control moving content**

i. **Issue:** The website lacks a mechanism for users to stop, pause, or play moving content, creating accessibility barriers for screen reader users,

individuals with attention difficulties, those with low vision, and keyboard navigators. Without these controls, users struggle to read or interact with content effectively.

ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** The absence of controls to manage moving content significantly impedes accessibility for screen reader users, individuals with attention difficulties, low vision, and keyboard navigators. Without the ability to pause, stop, or play the content, users face challenges in reading and interacting with it effectively. Expected Behavior: Users should be provided with control options, such as start, stop, and pause buttons or links, for managing slideshows. Additionally, screen reader users should be informed of the slideshow's presence through advance instructions, facilitating seamless access to the webpage.

**e. Carousel not accessible for screen readers**

i. **Issue:** Screen reader users are unable to identify carousel functionality. Upon landing on the page, the screen reader focuses on the carousel, but the current slide information is not announced, and there are no 'Next' or 'Previous' buttons to navigate the carousel. As a result, visually impaired users are unaware of the displayed slide, making navigation and interaction with the carousel challenging.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Working Example

iii. **Impact:** The inaccessibility of carousel functionality for screen reader users creates significant barriers. Users are unable to discern the displayed slide, hindering their ability to navigate and interact with the carousel effectively. Expected Behavior: The functionality of controls that dynamically add or update content should be communicated to screen reader users, enabling them to interact with these controls and access updated content effectively.

**f. Missing keyboard support for button**

i. **Issue:** The 'Play/pause' and pagination buttons are inaccessible via keyboard, obstructing users who depend on keyboards or assistive technologies from interacting with these elements. Consequently, users cannot perform essential actions like searching, thus creating a significant barrier to accessing necessary information on the website.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Users with visual or mobility impairments who rely on keyboards face difficulties in accessing the 'Play/pause' and pagination buttons. This lack of keyboard accessibility hinders their ability to interact with webpage functionalities, leading to exclusion from important content. Clearly defined element types are essential for screen reader users to identify actionable items, as failure to do so results in elements being misinterpreted as plain text.

**g. Missing accessible name for buttons**

i. **Issue:** The 'Play/Pause' and pagination buttons within the carousel lack accessible names, impairing screen reader users' ability to discern their function. This absence of clear labels prevents effective interaction with the carousel, as users may be unaware of how to pause auto-play or navigate slides.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Keyboard

iii. **Impact:** The lack of accessible names for the 'Play/Pause' and pagination buttons poses a barrier for screen reader users, impeding their ability to control and utilize the carousel. Properly labeled buttons are crucial for these users to understand and interact with the carousel, allowing them to manage playback and navigate content seamlessly.

**h. Tab elements are not programmatically defined**

i. **Issue:** The tab interface, including '3-Day Sale Thu-Sat Only', 'Sham-rocking Meat Deals', and 'Save Big on Katie's!', is improperly defined, complicating navigation for screen reader users. Without correct tab structure, users may not recognize these sections as tabs, leading to confusion and potential omission of important information.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Tabs

iii. **Impact:** The lack of proper tab definition creates a barrier for screen reader users, making it challenging to navigate and comprehend content. Proper tab roles and labeling are vital for these users to identify, switch between, and access tabbed content effectively.

**i. Missing keyboard support for tab interface**

i. **Issue:** The tab interface lacks keyboard functionality, obstructing screen reader users and those dependent on keyboard navigation from moving

between tabs or accessing content. This absence of keyboard support prevents access to critical information, creating a significant usability barrier.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Tabs

iii. **Impact:** Users reliant on keyboard navigation are unable to interact with the tab interface, impeding their ability to access and utilize the content. Full keyboard accessibility ensures that users can navigate tabs with ease, enhancing their experience and interaction with the web page.

**j. Identical and non-descriptive buttons announced for screen reader users**

i. **Issue:** The repeated button text 'Add to my list' in the main content area lacks specificity regarding the product being added, creating confusion for screen reader users. Without detailed descriptions, users face uncertainty and may resort to cumbersome steps to verify their selections.

ii. **WCAG 2.1 AA Violations:** 2.4.6 - AA - Headings And Labels

iii. **Impact:** The repetitive, non-descriptive button text presents a barrier for screen reader users, complicating their ability to discern which item is being selected. Providing detailed and descriptive button text is essential for these users to navigate effectively, minimizing confusion and enhancing their overall shopping experience.

**k. Incomplete textual description for image**

i. **Issue:** The alternative text for the logo image is insufficient, presenting an obstacle for users utilizing screen readers. It fails to convey all the information depicted in the image, resulting in users receiving only partial information, which complicates their ability to comprehend the full context.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** Users who are blind or visually impaired experience significant difficulty as the incomplete alternative text for the logo image leads to a lack of comprehensive information. This limitation hinders their understanding of the content, disadvantaging them compared to sighted users who can access the complete visual details.

**l. Breadcrumb links not accessible by screen reader**

i. **Issue:** Breadcrumb navigation components, intended to aid users in traversing extensive web content by structuring it into sequential pages, can become inaccessible to screen reader users when critical visual information is not effectively communicated, obstructing their comprehension of the page layout and navigation path.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Breadcrumb

iii. **Impact:** Visually impaired users, particularly those who rely on screen readers, face challenges in navigating web content due to breadcrumb components that do not adequately convey visual information. This can obscure their understanding of the order and hierarchy of navigation links, leading to confusion and making navigation less intuitive.

**m. Illogical focus order**

i. **Issue:** When a user activates a link that refreshes the content on the same page, the focus for keyboard or screen reader users remains on the original element, failing to indicate that the content has been updated. This oversight can lead to confusion and make it difficult for screen reader users to locate and access new content, thereby obstructing seamless navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** Users who are blind or visually impaired encounter significant barriers as the failure to update focus order upon content refresh can result in confusion and difficulty in accessing new information. This issue impedes efficient navigation and can prevent these users from engaging fully with the available content.

**n. Missing keyboard support for links**

i. **Issue:** The "Bakery & Desserts Pickup" item tiles are not accessible through keyboard navigation, creating difficulties for users who depend on keyboards for interaction. The absence of keyboard support restricts their ability to select or view these items, presenting a substantial barrier to full page utilization.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Users who rely on keyboards for navigation, including those with visual impairments, are unable to interact with the "Bakery & Desserts Pickup" item tiles due to the lack of keyboard accessibility.

This limitation prevents them from fully engaging with the page, denying them equal access to important content.

51. Defendant's Website was subsequently initially audited by Plaintiff's expert, Till Paris, on March 16, 2025, and who confirmed the access barriers that MYERS had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert during this initial audit are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers rendered Defendant's Website inaccessible to users who are blind and visually disabled, including MYERS.

52. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

53. Here, however, MYERS, through counsel, did send a pre-suit communication informing of the barriers to access on March 21, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

54. On or about April 22, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing Skip to Content Link**

i. **Issue:** The absence of a "Skip to content" link on the website necessitates that screen reader and keyboard users navigate through all header elements before accessing the main content. This omission creates a

barrier, impeding efficient navigation for screen reader users by forcing them to traverse repeated content, consequently slowing down their experience and complicating website usability.

ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** Screen reader and keyboard users encounter significant navigation barriers due to the missing "Skip to content" link. They must repeatedly navigate through all header elements before reaching the main content, leading to a time-consuming and cumbersome experience. The absence of this link hinders users from efficiently accessing critical information, making the website less accessible to those with visual impairments.

**b. Menu items inaccessible for screen reader users**

i. **Issue:** The header menu lacks appropriate semantic roles such as role="menu" and role="menuitem". Additionally, when the second and third menu items are expanded, keyboard focus erroneously shifts back to the first menu item. While menu items are accessible via arrow keys, this unexpected focus behavior introduces confusion for both keyboard and screen reader users.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Menubar Navigation

iii. **Impact:** The absence of proper semantic roles in the header menu and the incorrect keyboard focus behavior disrupt the navigation experience for users relying on screen readers and keyboard navigation. This can lead to confusion and difficulty in accessing the website's content, thereby affecting the inclusivity and accessibility of the site for visually impaired users.

**c. Content not hidden for screen reader users**

i. **Issue:** Hidden menu items in the header section unreasonably receive keyboard focus during navigation. This results in a challenging experience for keyboard-only users who may be unaware of the focus location. For screen reader users, the absence of contextual cues exacerbates navigation difficulties, making it arduous to understand the destination or purpose of the focused element.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** Keyboard-only and screen reader users face significant challenges due to hidden menu items receiving keyboard focus unexpectedly. This leads to a disjointed and confusing navigation experience, particularly for visually impaired users, as it becomes difficult to ascertain the context or purpose of the focused elements.

**d. No mechanism is provided to control moving content**

i. **Issue:** Users are not provided with a mechanism to pause, stop, or control moving content. The perpetual motion can become distracting or unmanageable for users with cognitive disabilities and screen reader users.

ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** The lack of control mechanisms for moving content poses significant accessibility barriers for users with cognitive disabilities and those using screen readers. Continuous motion without user control can cause disorientation, making it difficult for these users to focus on and interact with other website elements.

**e. Carousel not accessible for screen readers**

i. **Issue:** Screen reader users are unable to discern the carousel's functionality. When focus shifts to the carousel, the current slide information is not announced. Furthermore, the absence of "Next" and "Previous" buttons prevents users from navigating between slides using assistive technology.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A, 2.2.2 - A - Working Example

iii. **Impact:** The inaccessibility of the carousel for screen reader users significantly undermines their ability to interact with and benefit from the carousel's content. Without the announcement of slide information or navigation controls, visually impaired users are deprived of equal access to the information presented in the carousel.

**f. Missing keyboard support for button**

i. **Issue:** The "Play/Pause" and pagination buttons within the carousel are inaccessible via keyboard, preventing keyboard-only users from engaging with carousel controls.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 4.1.2 - A - Keyboard

iii. **Impact:** Keyboard-only users are unable to operate the "Play/Pause" and pagination buttons, thereby restricting their ability to interact with the carousel content, potentially missing critical information.

g. **Missing accessible name for buttons**

i. **Issue:** The "Play/Pause" and pagination buttons in the carousel lack accessible names, rendering them unidentifiable and unusable for screen reader users.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Keyboard

iii. **Impact:** Screen reader users are unable to discern the purpose of the "Play/Pause" and pagination buttons due to missing accessible names, leading to difficulties in engaging with these controls and accessing carousel information.

h. **Tab Interface Not Properly Defined**

i. **Issue:** The tab interface for "3-Day Sale Thu-Sat Only", "Sham-rocking Meat Deals", and "Save Big on Katie's!" is inadequately defined, lacking necessary roles, associations, and keyboard interactions, thus impeding effective use by screen reader and keyboard users.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Tabs

iii. **Impact:** Screen reader and keyboard users face significant barriers in navigating the tab interface due to absent roles and keyboard functionalities, preventing access to important content and interactive features.

i. **Missing keyboard support for tab interface**

i. **Issue:** The tab interface is non-operational with a keyboard, complicating navigation for screen reader users and those reliant on keyboard input, thereby obstructing access to tabbed content.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Tabs

iii. **Impact:** The lack of keyboard compatibility in the tab interface severely limits the ability of keyboard-dependent users to navigate and access essential information, significantly hindering page usability.

j. **Identical and non-descriptive buttons announced for screen reader users**

i. **Issue:** The "Add to my list" button lacks a distinctive, descriptive label, failing to provide screen reader users with adequate context regarding the button's function.

ii. **WCAG 2.1 AA Violations:** 2.4.6 - AA - Headings And Labels

iii. **Impact:** Screen reader users encounter confusion due to the absence of a unique, descriptive label for the "Add to my list" button, preventing them from understanding its purpose and interacting with it effectively.

**k. Incomplete Alt Text for Logo Image**

i. **Issue:** The alternative text for the logo image is incomplete, preventing screen reader users from fully accessing the information conveyed by the image. This results in users receiving only partial details, potentially leading to confusion or a lack of comprehension regarding the page's branding.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** Screen reader users are unable to access complete information about the logo image due to incomplete alternative text. This deficiency may cause confusion or an incomplete understanding of the page's branding.

**l. Breadcrumb Navigation Missing Programmatic Structure**

i. **Issue:** The breadcrumb navigation lacks programmatic definition, omitting roles or indicators such as aria-current, which impedes screen reader users from identifying the current page within the breadcrumb trail. This absence hinders effective navigation and comprehension of the website's structure.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A - Breadcrumb

iii. **Impact:** Screen reader users cannot discern their current location within the breadcrumb navigation due to the lack of programmatic markers, disrupting their understanding of the website's hierarchy and navigation.

**m. Focus Not Moving to Updated Content After Same Page Link Activation**

i. **Issue:** Activating a link that targets the same page does not shift the keyboard or screen reader focus to the updated content, leaving screen

reader users unaware of content changes. This oversight generates confusion and hinders access to the newly displayed information.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** Screen reader users experience confusion and inability to access newly updated content because the focus does not move after activating a same-page link, resulting in an inaccessible navigation experience.

**n. Keyboard Accessibility for Item Tiles**

i. **Issue:** The "Bakery & Desserts Pickup" item tiles are inaccessible via keyboard navigation, creating a barrier for keyboard-only users who are unable to interact with or reach this content, resulting in a lack of access to crucial information.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Keyboard-only users face an inaccessible experience due to the inability to access the "Bakery & Desserts Pickup" item tiles, which restricts their interaction with important content.

55. Additionally, MYERS' expert again audited Defendant's Website on April 23, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this April 23, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this April 23, 2025. Evaluation are further set forth in "Composite Exhibit 1."

56. On or about July 08, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are

inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing Skip to Content Link On The Page**

i. **Issue:** The webpage lacks a skip link (e.g., "Skip to main content") at the top of the page. This absence forces keyboard and screen reader users to navigate through repetitive blocks of content, such as navigation menus and headers, with each page load, hindering efficient access to the main content, particularly for individuals with mobility impairments or those using keyboard-only interactions.

ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** The absence of a skip link at the top of the page forces keyboard and screen reader users to navigate through repetitive content blocks, significantly delaying their ability to reach the main content. This is especially detrimental for users with mobility impairments or those relying solely on keyboard navigation, as it impedes efficient access to essential information.

**b. Menu items inaccessible for screen reader users**

i. **Issue:** The header menu lacks appropriate semantic roles, such as role="menu" for the container and role="menuitem" for individual items. Furthermore, when users expand the second or third menu items, the keyboard or screen reader focus incorrectly shifts to the first menu item, disrupting the expected navigation experience. Although arrow key navigation is supported, the erratic focus behavior creates a confusing and inaccessible experience for keyboard and screen reader users, complicating access to submenu content.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Menubar Navigation

iii. **Impact:** The improper semantic definition of the header menu and incorrect focus behavior upon expanding menu items create a disorienting navigation experience for keyboard and screen reader users. This lack of accessibility hampers their ability to access submenu content efficiently, significantly affecting their interaction with the website.

**c. Content not hidden for screen reader users**

i. **Issue:** In the header section, hidden menu items mistakenly receive keyboard focus, leading to a frustrating navigation experience for keyboard-only users who may be unaware of the focus location. For screen reader users, the absence of contextual cues exacerbates navigation difficulties, causing confusion about the purpose or destination of the focused element.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** The unintended keyboard focus on hidden menu items in the header section causes confusion and frustration for keyboard-only users. For screen reader users, the lack of contextual information further complicates navigation, making it difficult to comprehend the focus's purpose or destination, thus hindering an accessible user experience.

**d. No mechanism is provided to control moving content**

i. **Issue:** The absence of a mechanism to pause, stop, or control moving content results in continuous motion that can distract or impede navigation for users with cognitive disabilities or those using screen readers.

ii. **WCAG 2.1 AA Violations:** 2.2.2 - A - Pause Stop Hide

iii. **Impact:** The lack of control over moving content leads to continuous motion that can distract or obstruct navigation for users with cognitive disabilities or screen reader users. This absence of user control impairs the accessibility and usability of the website for these individuals.

**e. Carousel not accessible for screen readers**

i. **Issue:** The carousel does not convey its functionality to screen reader users. When focus lands on the carousel, the current slide information is not announced. Additionally, the absence of "Next" and "Previous" buttons prevents users from navigating between slides using assistive technology.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A, 2.2.2 - A - Working Example

iii. **Impact:** Screen reader users cannot recognize the carousel's functionality, and without announcements of current slide information or accessible navigation controls, they are unable to navigate between

slides. This lack of accessibility features severely restricts their ability to interact with and benefit from carousel content.

**f. Missing keyboard support for button**

i. **Issue:** The 'Play/Pause' and pagination buttons within the carousel are inaccessible via keyboard, rendering them unusable for users who rely solely on keyboard navigation.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 4.1.2 - A - Keyboard

iii. **Impact:** Users reliant on keyboard navigation are unable to operate the 'Play/Pause' and pagination buttons within the carousel, thereby missing out on interactive content and controls that are crucial for engaging with the carousel. Expected Behavior: All interactive elements, including 'Play/Pause' and pagination buttons, must be operable using a keyboard without requiring a mouse or touch.

**g. Missing accessible name for buttons**

i. **Issue:** The 'Play/Pause' and pagination buttons in the carousel lack accessible names, preventing screen reader users from understanding their functions.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Keyboard

iii. **Impact:** Screen reader users are unable to discern the purpose of the 'Play/Pause' and pagination buttons due to the absence of accessible names, resulting in an inability to utilize these controls. Expected Behavior: All interactive controls, including 'Play/Pause' and pagination buttons, must have accessible names using aria-label, aria-labelledby, or visible text to clearly indicate their function.

**h. Tab Interface Not Properly Defined**

i. **Issue:** The tab interface labeled as '3-Day Sale Thu-Sat Only', 'Sham-rocking Meat Deals', and 'Save Big on Katie's!' is inadequately defined, lacking necessary tab roles, associations, and keyboard interactions.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Tabs

iii. **Impact:** Screen reader and keyboard users are unable to effectively navigate the tab interface due to missing roles and associations, resulting in a lack of access to important content. Expected Behavior: All tabs must use correct roles such as role='tablist', role='tab', and

role='tabpanel'. Each tab must be associated with its tabpanel using aria-controls and indicate selection using aria-selected. Tabs should be operable via arrow keys for navigation.

**i. Missing keyboard support for tab interface**

i. **Issue:** The tab interface for '3-Day Sale Thu–Sat Only', 'Sham-rocking Meat Deals', and 'Save Big on Katie's!' is not structured with appropriate semantic roles and ARIA attributes, hindering screen reader and keyboard user interaction.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Tabs

iii. **Impact:** The lack of proper semantic roles and ARIA attributes in the tab interface prevents screen reader and keyboard users from navigating and interacting with the tabs, potentially missing out on significant content. Expected Behavior: Tabs should be contained in an element with role='tablist'.Each individual tab should have role='tab' and be focusable with the arrow keys. The active tab should have aria-selected='true' and tabindex='0'; inactive tabs should have aria-selected='false' and tabindex='-1'.The associated content region should have role='tabpanel' and be linked to the tab with aria-labelledby. Keyboard users should be able to move focus using the left/right arrow keys and activate a tab with Enter or Space.

**j. Identical and non-descriptive buttons announced for screen reader users**

i. **Issue:** The 'Add to my list' button lacks a distinct and descriptive label, obscuring its purpose from screen reader users.

ii. **WCAG 2.1 AA Violations:** 2.4.6 - AA - Headings And Labels

iii. **Impact:** The absence of a clear, descriptive label for the 'Add to my list' button prevents screen reader users from understanding its function, leading to potential confusion and inability to perform desired actions. Expected Behavior: Each button should have a unique, descriptive label or accessible name that provides meaningful information about the button's functionality, helping screen reader users understand its purpose and interact effectively with it.

**k. Incomplete Alt Text for Logo Image**

i. **Issue:** The alternative text for the logo image is incomplete, preventing screen reader users from fully accessing the information conveyed by

the image. This may lead to user confusion or a lack of understanding of the website's branding.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** Screen reader users receive only partial information due to incomplete alternative text, which can result in confusion and an incomplete understanding of the branding presented on the page.

**l. Breadcrumb Navigation Missing Programmatic Structure**

i. **Issue:** The breadcrumb navigation lacks programmatic definition, leaving screen reader users unable to identify the current page due to missing roles or indicators such as aria-current.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A - Breadcrumb

iii. **Impact:** Without programmatic markers, screen reader users cannot discern their current location in the breadcrumb trail, hindering effective navigation and comprehension of site structure.

**m. Breadcrumb Navigation Trail Not Defined Using Ordered List**

i. **Issue:** The absence of an <ol> element in the breadcrumb navigation trail prevents screen reader users from interpreting the sequence and hierarchy of navigation.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Breadcrumb

iii. **Impact:** Screen reader users are unable to perceive the breadcrumb trail as a linear, ordered sequence, impacting their understanding of the navigation path.

**n. Focus Not Moving to Updated Content After Same Page Link Activation**

i. **Issue:** Activation of same-page links does not shift focus to updated content, leaving screen reader users unaware of changes and unable to access new information.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** Without automatic focus movement to updated content, screen reader users may not realize content changes, causing confusion and inaccessible information.

**o. Keyboard Accessibility for Item Tiles**

i. **Issue:** "Bakery & Desserts Pickup" item tiles are inaccessible via keyboard, isolating keyboard-only users from essential content.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** Keyboard-only users face barriers accessing item tiles, resulting in a significant accessibility gap and preventing interaction with crucial content.

57. Additionally, MYERS' expert again audited Defendant's Website on July 09, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this July 09, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this July 09, 2025. Evaluation are further set forth in "Composite Exhibit 1."

58. On or about September 14, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Menu items inaccessible for screen reader users**

i. **Issue:** The header menu lacks appropriate semantic roles, such as role="menu" for the container and role="menuitem" for items, causing the keyboard or screen reader focus to incorrectly shift to the first menu item upon expanding the second or third items. This disrupts the expected navigation experience, making it difficult for keyboard and screen reader users to access submenu content.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.4.3 - A - Menubar Navigation

iii. **Impact:** Visually impaired users, particularly those who are blind, encounter significant challenges accessing submenu content due to improper semantic roles and incorrect focus behavior, leading to a disorienting navigation experience.

**b. Content not hidden for screen reader users**

i. **Issue:** Hidden menu items in the header section unexpectedly receive keyboard focus, creating confusion for keyboard-only users and complicating navigation for screen reader users due to a lack of contextual cues.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** This issue causes frustration and confusion for visually impaired users, especially those who are blind, as they struggle to understand the focus destination and purpose, hindering their navigation.

**c. No mechanism is provided to control moving content**

i. **Issue:** The carousel's auto-rotation feature lacks keyboard operability for its play/pause button, preventing keyboard-only and screen reader users from controlling carousel movement.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 2.2.2 - A - Pause Stop Hide

iii. **Impact:** Users with visual impairments, particularly those who are blind, face barriers as they are unable to stop auto-rotating content, limiting their ability to control and engage with carousel content.

**d. Carousel not accessible for screen readers**

i. **Issue:** The carousel fails to announce current slide information to screen readers and lacks navigational buttons, leaving users unaware of the carousel's structure and unable to interact with its content.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A, 2.2.2 - A - Working Example

iii. **Impact:** Visually impaired users, particularly those who are blind, are unable to perceive or interact with the carousel's content, missing essential information due to the lack of accessibility features.

**e. Missing keyboard support for button**

i. **Issue:** Carousel pagination buttons are inaccessible via keyboard, skipping keyboard-only users in focus order and lacking interactive exposure.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A, 4.1.2 - A - Keyboard

iii. **Impact:** Users with visual disabilities, especially those who are blind, are unable to navigate directly to specific slides, impeding their ability to interact with carousel content effectively.

**f. Missing accessible name for buttons**

i. **Issue:** The 'Play/Pause' button and the pagination buttons in the carousel lack accessible names, rendering them unidentifiable for screen reader users. This absence of labels prevents users from comprehending the functionality of the controls, obstructing effective carousel operation. Users encounter generic announcements like 'button' without context, creating a significant obstacle for those relying on assistive technologies.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Keyboard

iii. **Impact:** The absence of accessible names for the 'Play/Pause' button and pagination buttons in the carousel significantly hinders screen reader users from understanding the functionality of these controls. Consequently, they are unable to operate the carousel effectively, missing essential content. The lack of descriptive labels results in generic button announcements, posing a barrier for users who depend on assistive technology. Expected Behavior: All interactive controls in the carousel should possess descriptive accessible names. For instance, the Play/Pause button should have labels that dynamically update, such as 'Play Carousel' when paused, and 'Pause Carousel' when playing. Pagination buttons should include labels like 'Go to Slide 1' or 'Go to Slide 2 of 5,' ensuring screen reader users can discern the corresponding slide for each button.

**g. Tab Interface Not Properly Defined**

i. **Issue:** The tab interface encompassing '3-Day Sale Thu-Sat Only,' 'Sham-rocking Meat Deals,' and 'Save Big on Katie's!' lacks proper definition. The tabs are missing the appropriate ARIA roles (role='tab', role='tabpanel') and relationships (aria-controls, aria-selected). Furthermore, essential keyboard interactions, such as arrow key

navigation and tab order, are not implemented. This omission creates an accessibility barrier, leaving screen reader users and keyboard-only users unable to comprehend the tab structure or navigate between tabs, restricting access to available content.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Tabs

iii. **Impact:** The improper definition of the tab interface containing '3-Day Sale Thu-Sat Only,' 'Sham-rocking Meat Deals,' and 'Save Big on Katie's!' impedes screen reader and keyboard-only users from understanding the tab structure or switching between tabs. Consequently, they are denied access to the complete content. Expected Behavior: Each tab should be defined with role='tab' and associated with its corresponding tabpanel using aria-controls. The active tab must have aria-selected='true', while inactive tabs should have aria-selected='false'. Keyboard interactions must allow users to navigate between tabs using Left/Right arrow keys, activate a tab with Enter or Space, and move focus out of the tab list using Tab.

**h. Missing keyboard support for tab interface**

i. **Issue:** The tabbed interface containing '3-Day Sale Thu–Sat Only,' 'Sham-rocking Meat Deals,' and 'Save Big on Katie's!' lacks appropriate semantic roles or ARIA attributes, creating an accessibility barrier. This deficiency prevents screen reader and keyboard-only users from understanding the tab structure or recognizing the active tab. The absence of proper roles and relationships (role='tab', role='tabpanel', aria-controls, aria-selected) means the interactive behavior of the tabs is not communicated programmatically.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Tabs

iii. **Impact:** The lack of semantic roles and ARIA attributes in the tabbed interface containing '3-Day Sale Thu–Sat Only,' 'Sham-rocking Meat Deals,' and 'Save Big on Katie's!' obstructs screen reader and keyboard-only users from understanding the tab structure or identifying active tabs, denying them access to full content. Expected Behavior: Tabs should reside within an element with role='tablist'. Each tab must have role='tab' and be focusable with arrow keys. The active tab should have aria-selected='true' and tabindex='0'; inactive tabs should have aria-selected='false' and tabindex='-1'. The content region should have role='tabpanel' and be linked to the tab with aria-labelledby. Keyboard

users should navigate using left/right arrow keys and activate a tab with Enter or Space.

**i. Identical and non-descriptive buttons announced for screen reader users**

i. **Issue:** The 'Add to my list' button, identical across various items, lacks a clear and descriptive label, creating an accessibility barrier. Screen reader users are unable to discern which specific item the button pertains to. When buttons share the same text without additional context, users relying on assistive technologies cannot interact reliably with the correct item, leading to confusion and inaccessibility.

ii. **WCAG 2.1 AA Violations:** 2.4.6 - AA - Headings And Labels

iii. **Impact:** The lack of descriptive labels for the 'Add to my list' button, repeated across multiple items, significantly impedes screen reader users from determining the specific item the button affects. This results in confusion and inability to interact effectively with the desired item. Expected Behavior: Each button should possess a unique, descriptive label or accessible name that conveys meaningful information about the button's functionality, aiding screen reader users in comprehending its purpose and facilitating effective interaction.

**j. Incomplete Alt Text for Logo Image**

i. **Issue:** The alternative text for the logo image is incomplete, hindering screen reader users from accessing the full information presented in the image. This limitation may lead to confusion or an incomplete understanding of the page's branding.

ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Alt

iii. **Impact:** The incomplete alternative text for the logo image prevents screen reader users from obtaining the full information conveyed by the image, potentially causing confusion or an incomplete perception of the page's branding. Expected Behavior: The logo image should include comprehensive and descriptive alternative text, enabling screen reader users to fully grasp its significance and context.

**k. Breadcrumb Navigation Missing Programmatic Structure**

i. **Issue:** The breadcrumb navigation and the current page within it lack programmatic definition, causing significant challenges for users of screen readers. In the absence of proper roles or indicators such as aria-

current, screen reader users are unable to discern which breadcrumb item corresponds to the current page. This deficiency impairs their ability to navigate and comprehend the website's structure effectively.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A - Breadcrumb

iii. **Impact:** This issue severely impacts users with visual impairments, particularly those who are blind, as it obstructs their ability to correctly interpret their location within the website's hierarchy. Without programmatic cues, such users may experience confusion and difficulty in navigation, leading to a diminished user experience. Implementing proper semantic elements and attributes, like aria-current, is essential to enhance accessibility.

**l. Breadcrumb Navigation Trail Not Defined Using Ordered List**

i. **Issue:** The breadcrumb navigation trail is not marked up with an HTML <ol> (ordered list) element. This omission creates a barrier for screen reader users who depend on list semantics to comprehend the sequence and hierarchy of the navigation path. The absence of this structure prevents the interpretation of the breadcrumbs as a linear, ordered trail.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Breadcrumb

iii. **Impact:** This structural deficiency particularly affects visually impaired users, especially those who are blind, by hindering their ability to perceive the breadcrumbs as a sequential path. Properly structuring the breadcrumb trail with an <ol> element and marking the current page with aria-current="page" is crucial to facilitate an accurate understanding of the navigation sequence and improve user experience.

**m. Focus Not Moving to Updated Content After Same Page Link Activation**

i. **Issue:** Upon activation of links directing to the same page, such as anchor links or internal navigation, the focus does not transition to the updated content. This oversight results in confusion for screen reader users, as they are unaware of content changes and are unable to access the newly displayed information.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** This issue significantly impacts screen reader users, particularly those who are blind, by preventing them from receiving

notifications about content updates. To enhance accessibility, it is imperative to ensure the focus moves to the updated content, utilizing techniques like aria-live regions or programmatically focusing on the target, thereby facilitating better navigation and comprehension.

**n. Keyboard Accessibility for Item Tiles**

i. **Issue:** The "Bakery & Desserts Pickup" item tiles are inaccessible via keyboard navigation, presenting a formidable barrier for keyboard-only users who are unable to interact with or navigate to this content. This limitation impedes access to crucial information, resulting in an inadequate user experience.

ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Keyboard

iii. **Impact:** This issue adversely affects users relying solely on keyboard navigation, including those with visual disabilities. Ensuring keyboard accessibility of the item tiles by establishing a correct tab order, implementing suitable focus management, and utilizing interactive elements like buttons or links is essential to provide an inclusive and accessible experience.

59. Additionally, MYERS' expert again audited Defendant's Website on September 15, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this September 15, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this September 15, 2025. Evaluation are further set forth in "Composite Exhibit 1."

60. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

61. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic

components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

62. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

63. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50, 51, 54, 55, 56, 57, 58 and 59 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MYERS, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

64. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

65. Because of the inadequate development and administration of the Defendant's Website, MYERS is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

66. Enforcement of MYERS' rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

67. MYERS has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MYERS is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

68. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MYERS appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through the Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively

communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MYERS requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow

Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy

statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: October 16, 2025

Respectively submitted,

**ADA LEGAL TEAM, LLC**

/s/ Gregory S. Sconzo
Gregory S. Sconzo #0105553(FL)
Kevin W. Puckett #70706(MO)
4700 Belleview Avenue, Suite 100C
Kansas City, Missouri 64112
Phone: (816) 890-9599
Facsimile: (816) 203-8590
greg@ADALegalTeam.com
kevin@ADALegalTeam.com

**ATTORNEY FOR PLAINTIFF**